UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

STEPHEN M. YACKEL

                    Plaintiff,

                                        **REPORT AND RECOMMENDATION**
                                        **06-CV-0626 (DNH)**

MICHAEL J. ASTRUE[1]
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

# Jurisdiction

1.      This case was referred to this Court by Chief Judge Norman A. Mordue, pursuant

to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3.  This case has

proceeded in accordance with General Order 18 of this Court which sets forth the

procedures to be followed when appealing a denial of Social Security benefits.  Both

parties have filed briefs.  For the reasons discussed below, the Court recommends that

the matter be remanded for reconsideration.

# Background

2.      Plaintiff Stephen M. Yackel challenges the Administrative Law Judge's ("ALJ")

determination that he is not entitled to Disability Insurance Benefits ("DIB") or

Supplemental Security Income ("SSI"), under the Social Security Act ("the Act").

Plaintiff alleges that he was disabled from March 20, 2000, because of two replaced

discs in his neck/back, two herniated discs in his neck, limited use of his left shoulder

---

[1] On February 12, 2007, Michael J. Astrue was sworn in as the Commissioner of the Social Security
Administration.  Pursuant to Federal Rules of Civil Procedure 25(d)(1), he is automatically substituted for
former Commissioner Jo Anne Barnhart as the defendant in this action.

and arm due to nerve damage, carpal tunnel in his left arm, partial blindness in his left

eye, heart disease, anxiety, depression, obesity, and numbness in his left arm and leg.

In denying Plaintiff's claim, the ALJ found that during the time period in question,

Plaintiff was able to perform various light and sedentary jobs (R. at 27).[2]  Plaintiff has

met the disability insured status requirements of the Act at all times up through the date

of the ALJ's decision.

## Procedural History

3.      Plaintiff protectively filed for DIB and SSI on October 1, 2002 (R. at 50).  Both

claims were denied on January 15, 2003 (R. at 32).  Following a hearing, the ALJ

issued a decision on November 12, 2004, in which he found that Plaintiff had not met

the requirements for disability (R. at 29).  Plaintiff's request for review by the Appeals

Council was denied (R. at 4-7).

4.      On May 22, 2006, Plaintiff filed a Civil Complaint challenging Defendant's final

decision and requesting the Court review the decision of the ALJ pursuant to Section

405(g) and 1383(c)(3) of the Act, modify the decision of Defendant and grant DIB and

SSI to Plaintiff for the period beginning March 20, 2000.[3]  Defendant filed an answer to

Plaintiff's complaint on August 28, 2006, requesting the Court to dismiss Plaintiff's

complaint.  Plaintiff submitted a Memorandum of Law (hereinafter called "Plaintiff's

Brief") on January 27, 2007.  On March 15, 2007, Defendant filed a Memorandum of

Law in Support of His Motion (hereinafter called "Defendant's Brief") for Judgment on

---

[2] Citations to the underlying Administration are designated as "R."
[3] The ALJ's November 12, 2004, decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review.

the Pleadings[4] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  After full briefing, the Court deemed oral argument unnecessary and took the motions under advisement.

# Facts

### Medical Examiners[5]

5.      Plaintiff underwent a cardiac catheterization on February 15, 1991 (R. at 128).  Dr. Rashdan, the physician completing the exam, found "1. Normal coronary arteries.  2. Hyperkinetic heart syndrome, secondary to obesity.  3. Very slight left ventricular dysfunction consistent with long history of heavy alcohol use" (R. at 129).  Dr. Rashdan recommended Plaintiff start a trial of beta blockers, lose weight, and stop drinking alcohol.  Id.

Plaintiff met with psychiatrist Dr. Monterrey on June 17, 1993, for a psychiatric evaluation (R. at 138).  Plaintiff complained of depression and feeling helpless (R. at 137).  Dr. Monterrey diagnosed Axis I, depression; Axis II, substance abuse in remission; and Axis III, over weight.  Id.  Plaintiff was prescribed a medication for thirty days, but the name of the medication was not legible.  Id.  Plaintiff continued to see Dr. Monterrey through July 14, 1994 (R. at 134-136).  During that time, Plaintiff continued to complain of depression, but Dr. Monterrey did note some improvement (R. at 136).

Plaintiff had an MRI of his brain on January 24, 1996 (R. at 139).  Dr. Muhletaler, the physician completing the exam, found it to be unremarkable.  Id.  The following day,

---

[4] Plaintiff filed a motion for summary judgment with the brief, Defendant did not.  Dkt. #7.  Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceedings as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"
[5] A portion of the record post dates the ALJ's decision.  Medical records concerning dates past the ALJ's decision will only be included to the extent they are relevant to this decision.

Plaintiff underwent a scan of his chest (R. at 140).  Dr. Kanter, the physician completing the exam, found "no acute active cardiopulmonary process."  Id.

Plaintiff met with Dr. Halperin, at Retina Vitreous Consultants, on January 26, 1996, after a sudden loss of vision in his left eye two weeks prior to the date of his appointment (R. at 152-153).  Dr. Halperin diagnosed Neuroretinitis,[6] OS (R. at 153).  Plaintiff was started on Pred Forte[7] and Doxycycline.[8]  Id.

Plaintiff went to University Hospital on October 13, 1998, after a soccer goal fell on his head while at work, causing him to fall off his sport utility vehicle (R. at 160, 163).  Plaintiff denied any loss of consciousness, but witnesses noted he became very sleepy and had trouble waking (R. at 163).  "His CT scan o[f] the head was negative except for some soft tissue swelling over the left forehead . . . .  There was no evidence of fracture and no intracerebral bleed or tissu[e] edema noted" (R. at 160).  Plaintiff's right forearm films were negative except for soft tissue swelling.  Id.  Plaintiff's cervical spine films were also negative.  Id.  Plaintiff was discharged later that day (R. at 159).

Plaintiff was referred to Dr. Criscitiello by the ER after his accident (R. at 320).  Plaintiff's met with Dr. Criscitiello's nurse, Donna Schermerhorn, on October 15, 1998 (R. at 319-320).  Plaintiff complained of pain in his left forehead and neck (R. at 320).  Ms. Schermerhorn recommended Plaintiff discontinue his Tylenol with Codeine and instead use standard Tylenol or Motrin (R. at 319).

---

[6] "[I]nflammation of the optic nerve and retina."  *Dorland's Illustrated Medical Dictionary*, 1289 (31st ed. 2007).
[7] Trademark for Prednisolone acetate, "applied topically to the conjunctiva in the treatment of allergy and inflammation."  Pred Forte, *Drugs.com*, http://www.drugs.com/pdr/pred-forte.html; *Dorland's* at 1531.
[8] An antibiotic.  *Dorland's* at 572.

Plaintiff met with Ms. Schermerhorn again on October 27, 1998 (R. at 318-319). Plaintiff complained of neck pain and headaches, but denied any arm or shoulder pain (R. at 319). Plaintiff also stated that he would occasionally have tingling in his right hand and left arm weakness. Id. Ms. Schermerhorn noted a slight decrease in range of motion in Plaintiff's left arm (R. at 318-319). Ms. Schermerhorn recommended physical therapy (R. at 318).

Plaintiff began physical therapy at Summit Physical Therapy, P.C. on November 2, 1998, and continued through March 19, 1999 (R. at 176-213). Physical therapist, Michael Hope, wrote a letter to Nurse Schermerhorn, on November 6, 1998 (R. at 207). In it, Mr. Hope stated that Plaintiff complained of constant neck and arm pain and also headaches. Id. Plaintiff also complained of some nausea, dizziness, and tinnitus. Id. Mr. Hope stated he believed that Plaintiff had underlying rotator cuff involvement in his left shoulder. Id.

Plaintiff underwent a scan of his left shoulder on November 10, 1998, at Dr. Criscitiello's request (R. at 315). Dr. Ambrose, the physician completing the exam, found "an old chip fracture off the inferior aspect of the glenoid, but other than this the study is unremarkable." Id.

Plaintiff also met with Ms. Schermerhorn that same day (R. at 318). Plaintiff complained of neck, left shoulder, and arm pain, as well as arm weakness and headaches. Id. Plaintiff also stated that he was feeling anxious about what was happening to him (R. at 317-318). Ms. Schermerhorn opted to take Plaintiff out of work indefinitely because of his dizziness and pain (R. at 317).

5

Plaintiff met with Dr. Scerpella on November 18, 1998, for an evaluation of his left shoulder (R. at 250-251).  Plaintiff complained of pain in his left shoulder that radiated down to his thumb and index finger (R. at 250).  Plaintiff stated his headaches had improved and reported minimal to no neck pain.  Id.  Dr. Scerpella diagnosed left shoulder rotator cuff tendinitis (R. at 251).

That same day, Plaintiff also met with Ms. Schermerhorn (R. at 316).  Plaintiff complained of headaches and dizziness.  Id.  Ms. Schermerhorn opined that Plaintiff had received a concussion as a result of the accident.  Id.  Plaintiff stated he had almost no neck pain (R. at 317).

On November 23, 1998, physical therapist, Timothy Stayer, sent a letter to Dr. Scerpella (R. at 175).  Mr. Stayer stated that Plaintiff was in that day for left shoulder rotator cuff tendinitis related to the accident.  Id.

Physical therapist, Mr. Hope wrote another letter to Ms. Schermerhorn on December 2, 1998 (R. at 200).  Mr. Hope stated that Plaintiff noted some temporary relief, but was still in a lot of pain.  Id.  Plaintiff's dizziness and nausea were also not improving.  Id.

Plaintiff underwent an MRI scan of his cervical spine on December 3, 1998, at Dr. Criscitiello's request (R. at 314).  Dr. Joy, the physician completing the exam, found "annular bulges at the C3-C4, C4-C5, C5-C6, C6-C7, and T3-T4 intervertebral levels. There is a moderate partially contained left paracentral disc herniation at the C5-C6 intervertebral level with mild impingement of the ventral aspect of the spinal cord."  Id.

6

On December 10, 1998, registered nurse, Kathleen McCabe,[9] filled out a disability management report for the workers' compensation board (R. at 241-243). Several pages of the report appear to be missing from the record.

Plaintiff underwent electrodiagnostic testing with Dr. Zhu at Dr. Criscitiello's request on December 15, 1998 (R. at 312). Dr. Criscitiello wished to rule out cervical radiculopathy. Id. Dr. Zhu found "electrodiagnostic evidence of cervical nerve root irritation, affecting mainly the C6 and the C7 roots on the left side. . . . Carpal Tunnel Syndrome on the right side . . . . [N]o electrodiagnostic evidence of plexopathy or polyneuropathy in the upper extremities." Id.

Plaintiff met with Dr. Criscitiello on December 21, 1998 (R. at 310-311). Plaintiff complained of headaches, neck pain, shoulder pain, and forearm pain (R. at 311). Dr. Criscitiello noted that Plaintiff had injections with Dr. Scerpella and obtained great relief. Id. The Dr. Criscitiello plan was that if and when Dr. Scerpella's treatments ceased to work, the next step would be root injections with Dr. Thomas (R. at 310). An EMG was positive at the C6 and C7 nerve root, indicating involvement at the cervical level (R. at 311). Dr. Criscitiello opted to let Dr. Scerpella determine whether surgery was warranted (R. at 310).

Plaintiff saw Dr. Scerpella again on January 6, 1999 (R. at 249). Dr. Scerpella stated that an MRI would be needed to diagnose a rotator cuff tear. Id. On January 14, 1999, Plaintiff underwent an MRI of his left shoulder (R. at 248). Dr. Hojnowski, the physician completing the exam, found "[m]inimal inflammatory or degernative changes of the supraspinatus tendon; otherwise negative." Id.

---

[9] Many of Ms. McCabe's reports repeat medical documents already in the record. Ms. McCabe's reports will only be included to the extent that they reveal new medical history.

Plaintiff met with Dr. Nitka, at Ms. McCabe's request, on January 21, 1999, for a neurological exam (R. at 171-173).  Plaintiff complained of headaches that would occur about two to four times a week and would last several hours (R. at 171).  Plaintiff tried over-the-counter Excedrin Migraine, but it was not always effective.  Plaintiff denied any headaches or neck pain prior to the incident.  Id.  Dr. Nitka noted that Plaintiff's headaches could the result of a concussion, and would likely improve with time (R. at 172).  Dr. Nitka prescribed Prozac[10] which would help with his pain and also curb his appetite, as Plaintiff stated he had gained 67 pounds since the accident.  Id.  The following day, Plaintiff underwent a CT scan at Dr. Nitka's request (R. at 172-173).  Dr. Schneider, the physician completing the exam, noted a "[n]ormal brain CT showing no change from 10/98" (R. at 173).

Ms. McCabe filled out another report on January 29, 1999 (R. at 232).  Plaintiff complained of dizziness, severe pain, and severe headaches (R. at 232-233).

Plaintiff met with Dr. Criscitiello on February 15, 1999 (R. at 308).  Dr. Criscitiello noted that Plaintiff's neck pain seemed more severe than his arm pain (R. at 309).  Dr. Criscitiello recommended Plaintiff return to physical therapy.  Id.  Dr. Criscitiello noted that Plaintiff's reflexes were decreased in his left arm.  Id.  Dr. Criscitiello also stated he would attempt to get a neurological consult for his headaches that likely resulted from the accident.  Id. Dr. Criscitiello also suggested epidural injections with Dr. Thomas if Plaintiff's pain was not much improved in six to eight weeks (R. at 308).

Physical therapist, Mr. Stayer sent another letter to Dr. Scerpella on February 17, 1999, stating Plaintiff completed his physical therapy on February 3, 1999, and was

---

[10] Trademark for fluoxetine hydrochloride, treats "depression, obsessive-compulsive disorder, bulimia nervosa, and premenstrual dysphoric disorder;" *Dorland's* at 1562, 730.

being discharged (R. at 174).  Mr. Stayer also stated that Plaintiff had increased shoulder range of motion and decreased pain.  Id.

On February 17, 1999, Plaintiff was back with Dr. Scerpella (R. at 245).  Plaintiff stated he was no longer having any shoulder discomfort and Dr. Scerpella found a full range of motion.  Id.  Plaintiff was diagnosed with left shoulder impingement syndrome, and Dr. Scerpella did not believe it required any further intervention on his part.  Id.

On February 24, 1999, physical therapist Mr. Hope wrote a letter to Dr. Criscitiello (R .at 193).  Mr. Hope stated that Plaintiff continued to have constant neck and arm symptoms and had disturbed sleep.  Id.  Mr. Hope noted that Plaintiff's MRI and CT scan were positive for carpal tunnel syndrome and a bulge.  Id.

Plaintiff met with Nurse Schermerhorn and Dr. Criscitiello on March 25, 1999 (R. at 307).  Plaintiff stated that there was a period of time when his neck pain improved, but that recently it increased in severity.  Id.  Plaintiff also indicated that physical therapy was helping with his arm pain.  Id.  Epidural injections were suggested to Plaintiff, and he wish to proceed with that option.  Id.

Another report was filled out by Ms. McCabe on April 15, 1999 (R. at 225-226). Plaintiff stated his arm pain had diminished significantly, but his neck pain had increased (R. at 225).  Plaintiff stated he was taking Ultram.[11]  Id.

Plaintiff met with Dr. Siddiqui at the office of Dr. Thomas[12] on April 23, 1999 (R. at 254-255).  Plaintiff complained of left arm pain that would radiate down to his left thumb (R. at 254).  Plaintiff stated that while medications helped, nothing completely eradicated the pain.  Id.  Plaintiff was diagnosed with cervical radiculopathy (R. at 255).

_____

[11] Trademark for tramadol hydrochloride, an analgesic.  *Dorland's* at 2027, 1997.
[12] Dr. Thomas is a professor of anesthesiology and director of the Pain Treatment center (R. at 254).

On May 20, 1999, Plaintiff underwent a pain block at University Hospital at Dr. Thomas' direction (R. at 272).

On May 27, 1999, Ms. McCabe filled out another report (R. at 222-224).  Plaintiff stated that the pain in his lower back had decreased, but pain in his neck and right arm continued (R. at 222).  Plaintiff stated he felt much better after the injection (R. at 223).

Plaintiff underwent another injection on June 3, 1999, at Dr. Thomas' direction (R. at 268).  Another injection was completed on June 17, 1999 (R. at 265).

On July 28, 1999, Neurologist Dr. Stewart sent Cheryl Michalski[13] a letter (R. at 217-219).  Dr. Stewart noted Plaintiff signed a form stating he was not Plaintiff's treating doctor (R. at 217).  Dr. Stewart opined that Plaintiff had a partial mild disability, his subjective complaints were not in proportion to the objective findings, he reached maximum medical improvement, and "his current disability is made materially and substantially worse as a result of his pre-existing history of drug and alcohol abuse, hyperkinetic heart syndrome and gross obesity than it would be for the neck strain injury of 10/13/98 alone" (R. at 218).

Plaintiff met with Dr. Thomas and Dr. Ali on August 6, 1999 (R. at 253).  Plaintiff continued to complain of arm and neck pain.  Id.  The doctors noted that Plaintiff had previously undergone cervical epidural steroid blocks and a trigger point injection with great relief.  Id.  Plaintiff was referred to Dr. Loftus for a left carpal tunnel evaluation.  Id.  Plaintiff's medications of Neurontin[14] and Vioxx[15] were continued.  Id.

---

[13] It appears that Ms. Michalski works with Ms. McCabe (R. at 222, 223).
[14] Trademark for gabapentin, an anticonvulsant.  *Dorland's* at 1287, 764.
[15] Trademark for rofecoxib, an anti-inflammatory.  *Dorland's* at 2086, 1677.

Dr. Scerpella wrote a letter to Kathy Bazicki, the secretary to the medical board, on August 26, 1999 (R. at 244).  In it, Dr. Scerpella stated that he "believe[d] that the injury that occurred on 10/13/1998, is the competent producing cause of [Plaintiff's] left shoulder injury."  Id.  Dr. Scerpella also stated that Plaintiff was released from his care because Plaintiff no longer had any shoulder discomfort.  Id.  Dr. Scerpella opined that Plaintiff "was capable of performing his usual work duties, as of February 17, 1999."  Id.

Plaintiff had another injection on September 28, 1999, at Dr. Thomas' request (R. at 262).  Plaintiff also had injections on October 14, 1999, and October 28, 1999 (R. at 261, 256).

Plaintiff underwent an MRI on November 17, 1999 (R. at 304-305).  Dr. Joy, the physician completing the exam, found "annular bulges at the C3-C4, C6-C7, and T3-T4 levels.  At the C5-C6 intervertebral level there is an annular bulge, osteophyte, and a small to moderate partially contained central and left paracentral disc herniation with mild impingement on the spinal cord" (R. at 305).

On December 21, 1999, neurosurgeon Dr. Naumann sent Ms. Michalski a letter (R. at 274-276).  In it, Dr. Naumann opined that Plaintiff had a "temporary disability in the mild to moderate range" (R. at 274).  He also stated that an anterior discectomy with interbody fusion would be the most appropriate course of action.  Id.  Dr. Naumann believed Plaintiff had a "quite good" prognosis.  Id.

Plaintiff met with Dr. Criscitiello on Janauary 5, 2000 (R. at 301).  Dr. Criscitiello recommended a C5/6 discectomy and fusion, and possibly the same at C6/7.  Id.

Plaintiff met with Nurse Schermerhorn on March 10, 2000, at the request of Dr. Criscitiello (R. at 298).  Dr. Criscitiello had concerns that Plaintiff's high blood pressure would affect his surgery on March 16, 2000 (R. at 298).

Plaintiff was admitted to University Hospital and University Health Care Center on March 16, 2000 (R. at 277).  Plaintiff underwent an "[a]nterior left-sided C5-C6 discectomy and fusion with a Danek allograft strut and Surgical Dynamic Accufix locking plate" (R. at 279).  There were no complications and Plaintiff tolerated the procedure well (R. at 280).  Plaintiff was discharged the following day (R. at 277).

On March 20, 2000, Plaintiff met with Dr. Criscitiello (R. at 293).  Plaintiff complained of pain in the back of his neck.  Id.  Dr. Criscitiello noted that Plaintiff's wounds were clean, dry, and healing well.  Id.

Plaintiff met with Dr. Criscitiello on June 7, 2000 (R. at 291).  Dr. Criscitiello noted that Plaintiff's X-rays, taken that day, "show a stable fusion at the cervical spine and the graft and plate remain in a good position."  Id.  Overall, Dr. Criscitiello found Plaintiff to be doing quite well.  Id.

On August 11, 2000, orthopedic surgeon, Dr. Ortiz, wrote Ms. Michalski a letter concerning Plaintiff's August 8, 2000 visit (R. at 283-286).  Dr. Ortiz diagnosed "[s]tatus post anterior cervical fusion C5-6 and discetomy with plate and screw fixation of 3/16/00" (R. at 283).  Dr. Ortiz opined that Plaintiff continued to be temporarily totally disabled because the fusion was not complete.  Id.  He stated that this temporary total disability would last for at least three more months, at which time another examination should be conducted.  Id.  Plaintiff's chief complaint was neck pain with limitation of motion, weakness in his left arm, and pain that would radiate from his neck to his left

12

thumb accompanied by occasional tingling and numbness (R. at 284). Plaintiff was currently taking Codeine. Id.

Plaintiff met with Nurse Schermerhorn, on September 7, 2000, at Dr. Criscitiello's office (R. at 289). Plaintiff stated that his pain was much improved after surgery, but that it was recently increasing. Id. Plaintiff was also concerned about Dr. Criscitiello's leaving.[16] Id. Ms. Schermerhorn recommended that Plaintiff wean off of the Tylenol with Codeine, and only take standard Tylenol. Id. Ms. Schermerhorn noted that Plaintiff was still temporarily totally disabled. Id.

On December 26, 2000, neurologist and orthopedist Dr. Yonemura sent a letter to Dr. Finkenstadt (R. at 321-324). Dr. Yonemura stated that Plaintiff complained of arm pain, neck pain, some left thigh pain, and left shoulder pain but no numbness or radiation into his hands (R. at 321). Dr. Yonemura diagnosed "1. Left shoulder myofascial pain.  2. Status post C5-6 anterior cervical discectomy and fusion.  3. C3-4 hypermobility with retrolisthesis – asymptomatic" (R. at 323). Dr. Yonemura wished to refer Plaintiff to Dr. Finkenstadt for a musculoskeletal evaluation (R. at 324). Plaintiff was switched from Vioxx to Daypro.[17] Id.

Plaintiff met with Dr. Finkenstadt on April 12, 2001 (R. at 336-337). Plaintiff complained of left sided neck and arm pain (R. at 336). Dr. Finkenstadt "d[id] not feel he has[d]any significant shoulder pathology other than a mild capsular contraction secondary to nonuse of the left shoulder.  He may also have some residual cervical disc

---

[16] It is unclear from the record whether the doctor was leaving the practice or the clinic or whether the doctor was transferring Plaintiff's file to another doctor.
[17] Trademark for oxaprozin, an anti-inflammatory. *Dorland's* at 479, 1376.

problem with radiculopathy contributing to his symptoms as well" (R. at 337).  Dr.

Finkenstadt recommended a trial of Prolotherapy injections and physical therapy.  Id.

Plaintiff met with Dr. Finkenstadt again on July 19, 2001 (R. at 335).  Plaintiff

continued to complain of chronic neck and left shoulder pain.  Id.  Dr. Finkenstadt

recommended several more Prolotherapy treatments and also prescribed Vioxx.  Id.

On August 7, 2001, orthopedic surgeon, Dr. Ferraraccio evaluated Plaintiff at Ms.

Michalski's request and sent her a letter on August 8, 2001 (R. at 325-330).  Dr.

Ferraraccio diagnosed Plaintiff with "1. Status post cervical fusion and discectomy C5-6,

03/16/00.  2. History of hyperkinetic heart syndrome.  3. History of obesity" (R. at 325).

Dr. Ferraraccio stated that Plaintiff had subjective complaints, but there was no

objective neurological deficit.  Id.  Dr. Ferraraccio opined that Plaintiff "ha[d] a marked

level of temporary partial disability."  Id.  Dr. Ferraraccio found the following in terms of

Plaintiff's limitations:

> his lifting would have to be limited to 10 lbs. or less on an occasional
> basis.  He would not be able to use the arms at or above shoulder level.
> He should not engage in repetitive range of motion of the cervical spine,
> nor be required to hold the head or neck in a fixed position.

(R. at 326).  Dr. Ferraraccio did not believe Plaintiff had reached his maximum medical

improvement, which may not occur until twenty-four months after surgery.  Id.

On August 16, 2001, Plaintiff was seen again by Dr. Finkenstadt (R. at 334).

Although Plaintiff had the same complaints, Dr. Finkenstadt noted that Plaintiff

appeared to be improving with each treatment.  Id.

14

Plaintiff underwent more injections with Dr. Finkenstadt on September 12, 2001 (R. at 333).  Dr. Finkenstadt believed the treatments were helping with Plaintiff's pain.  Id.  Plaintiff began to complain that his right shoulder hurt.  Id.

On October 15, 2001, Plaintiff saw Dr. Finkenstadt again (R. at 332).  Despite noting that Plaintiff improved with each treatment, he stated that Plaintiff was "essentially totally disabled."  Id.  Dr. Finkenstadt also opined that Plaintiff's left shoulder pain may "have an element of tendonitis/bursitis contributing to [his] symptoms."  Id.

Plaintiff saw Dr. Finkenstadt again on January 22, 2002 (R. at 331).  Dr. Finkenstadt noted that Plaintiff's neck was more than 50% better.  The doctor advised Plaintiff to follow up with Dr. Scerpella for his shoulder treatment, but Dr. Finkenstadt would continue his neck treatments.  Id.  Dr. Finkenstadt noted that Plaintiff would need to improve his left shoulder function before he would be able to return to work.  Id.

Plaintiff was admitted to the psychiatric ward of St. Joseph's Hospital on September 11, 2003 because of suicidal ideation due, in part, to his mother's death four days earlier (R. at 386).  Id.  Plaintiff was admitted to the hospital because he ~~took~~ had taken approximately ten Valium[18] that day and began shooting his gun outside, at which time his wife thought Plaintiff had shot himself and she called the Police (R. at 389).  Plaintiff's attending physician at the Hospital was psychiatrist Dr. Ghaly. Lisa Wolniak, Dr. Ghaly's registered physician's assistant-certified, noted that Plaintiff was currently taking Prozac.  Id.

Plaintiff was initially diagnosed by Dr. Ghaly with major depression (R. at 392).  Plaintiff was discharged on September 16, 2003 (R. at 386).  Dr. Ghaly's diagnosis on

---

[18] Trademark for diazepam, an anti-anxiety agent. *Dorland's* at 2049.

discharge was Axis I, "[b]ipolar disorder, depressed, type-II.  History of polysubstance dependence in remission" (R. at 387).

Plaintiff underwent a CT of his cervical spine on September 15, 2003, while at St. Joseph's Hospital (R. at 440-441).  Dr. Jacobs, the physician conducting the exam, found "C2-3 moderate diffuse disc bulge and posterior endplate osteophyte formation minimally flattens the ventral thecal sac.  Minimal diffuse disc bulge and posterior endplate vertebral body spurring minimally indents the thecal sac at C3-4.  Surgical fusion C5-6 with posterior endplate osteophyte formation narrowing the spinal canal to an AP diameter of 11 mm at this level" (R. at 441).

Plaintiff began seeing Dr. Ghaly after his release from the psychiatric ward and met with Dr. Ghaly[19] again on September 23, 2003 (R. at 438).

Plaintiff met with Dr. Catania on October 1, 2003 (R. at 378).  Dr. Catania intended to treat Plaintiff for several issues, including his cervical disc disease, hypertension, and general health maintenance.  Id.  Plaintiff also wished to receive psychiatric treatment.  Id.

On October 6, 2003, Plaintiff was back with Dr. Ghaly (R. at 437).  Dr. Ghaly noted that Plaintiff was feeling somewhat better.  Id.

Plaintiff saw Dr. Catania again on November 3, 2003 (R. at 377).  Based on recent blood work, Plaintiff was diagnosed with hypercholesterolemia.  Id.  Dr. Catania wished to treat this with lifestyle modifications and would recheck Plaintiff's cholesterol

---

[19] The signatures on all the treatment notes for this source were illegible (R. at 436-438).  The header on the treatment notes indicates that they are from Dr. Ghaly (R. at 436-438).  Dr. Ghaly also supplied a medical report concerning her belief of Plaintiff's mental limitations (R. at 433-435).  Therefore, this Court will assume that Plaintiff met with Dr. Ghaly.

level in one year.  Id.  For Plaintiff's hypertension, Dr. Catania suggested decreasing

Plaintiff's Toprol.[20]  Id

     Plaintiff also underwent a scan of his cervical spine on November 3, 2003 (R. at

453).  Dr. Grimmond, the physician completing the exam, found "[s]tatus post fusion C5-

C6 with multilevel disc disease.  Good stability of the cervical spine with flexion and

extension."  Id.

     The following day, Plaintiff underwent an MRI of his cervical spine (R. at 454).

Dr. Sternick, the physician completing the exam, found "[p]ost operative change at C5-

C6.  No evidence for recurrent disc herniation or significant fibrotic change.  Mild

posterior disc bulging at C6-C7 and C3-C4 that is unchanged.  On Sagittal scans there

may be minimal posterior disc bulging as well at T3-T4 that is unchanged.  Fusion of C7

and T11 vertebra again apparent.  This is likely congenital."  Id.

     Plaintiff met with Dr. Ghaly again on November 6, 2003 (R. at 436).  Dr. Ghaly

noted that Plaintiff was still experiencing many episodes of feeling anxious and

hopeless.  Id.

     Dr. Ghaly completed a mental medical report for Plaintiff on January 10, 2004 (R.

at 433-435).  Dr. Ghaly diagnosed Plaintiff with bipolar disorder with a guarded

prognosis (R. at 433).  Plaintiff was treated with medication and had a fair response.  Id.

Dr. Ghaly opined that Plaintiff was not limited in his ability to understand and remember

short, simple instructions, and in his ability to carry out short, simple instructions (R. at

434).  Dr. Ghaly found that Plaintiff had a slight limitation to understand and remember

detailed instructions.  Id.  Dr. Ghaly stated that Plaintiff was moderately limited in his

---

[20] Trademark for metoprolol succinate, "used for the treatment of angina pectoris and hypertension...."
*Dorland's* at 1966, 1172.

ability to carry out detailed instructions and in his ability to make judgments on simple

work-related decisions.  Id.  Dr. Ghaly also made findings as to Plaintiff's ability to

interact with others (R. at 435).  Dr. Ghaly opined that Plaintiff had a slight limitation in

his ability to interact appropriately with the public, supervisor(s), and co-workers.  Id.

Dr. Ghaly found that Plaintiff had a moderate limitation in his ability to respond

appropriately to work pressures in a usual work setting and to changes in a routine work

setting.  Id.  Finally, Dr. Ghaly noted that Plaintiff's function was impaired when he was

under pressure.  Id.

On April 12, 2004, Plaintiff met with Dr. Catania complaining of tightness in his

chest and fatigue (R. at 430).  Dr. Catania opted to refer Plaintiff to a cardiologist, Dr.

Muller (R. at 431-432).

Plaintiff met with registered nurse and nurse practitioner, John Jessup, and Dr.

Muller, at the SJH Cardiology Associates on April 20, 2004 (R. at 423).  Plaintiff

underwent an EKG, which showed a normal sinus rhythm.  Id.  Plaintiff was given

samples of Lipitor[21] to help lower his cholesterol and his Lopressor[22] was increased to

lower his heart rate and blood pressure.  Id.

Plaintiff saw Dr. Catania again on April 26, 2004 (R. at 428).  Dr. Catania noted

that Dr. Muller was unable to schedule Plaintiff for a stress test until the middle of June

(R. at 429).  Dr. Catania did not want to wait that long, and opted to go forward with a

---

[21] Trademark for atorvastatin calcium, treats hypercholesterolemia and dyslipidemia.  *Dorland's* at 1077, 175.
[22] Trademark for metoprolol tartrate,"used in the treatment of hypertension, angina pectoris, and myocardial infarction;" *Dorland's* at 1089, 1172.

cardiac catheterization without the stress test.  Id.  Dr. Catania also increased Plaintiff's metoprolol[23] and started him on Plavix[24] and Isordil[25] (R. at 451).

On April 30, 2004, Plaintiff underwent a left heart catheterization with Dr. Giabartolomei (R. 425-426).  Dr. Giabartolomei found "[m]ild coronary artery disease and normal ventricular function in patient with symptoms mimicking angina pectoris . . . . I believe that the patient's symptoms are not related to myocardial ischemia" (R. at 425).

Plaintiff met with Dr. Buckley on May 23, 2004 (R. at 456-457).  Plaintiff complained of left shoulder pain (R. at 456).  Dr. Buckley recommended "an MRI with gadolinium of the cervical spine" (R. at 457).

On September 9, 2005, Dr. Catania filled out a physical medical report for Plaintiff (R. at 483-485).  In it, Dr. Catania stated that Plaintiff complained of severe and constant pain in his neck and back, and that those complaints were consistent with examinations and test findings (R. at 483).  Dr. Catania stated that Plaintiff had undergone treatments with Dr. Finkenstadt with success (R. at 484).  Dr. Catania noted that Plaintiff's symptoms had somewhat improved since their first meeting, but his level of function was markedly compromised and he had a poor prognosis.  Id.  Dr. Catania opined that Plaintiff's impairments had lasted, or could be expected to last, at least for twelve months.  Id.  Dr. Catania stated that Plaintiff's former job would have an adverse effect on Plaintiff's health, his impairments were not likely to produce good and bad days, and almost all physical activities would aggravate Plaintiff's conditions.  Id.

---

[23] See n. 20, 22.
[24] Trademark for clopidogrel bisulfate, used "for the prevention of myocardial infarction, stroke, and vascular death in patients with atherosclerosis;" Dorland's at 1480, 380.
[25] Trademark for isosorbide dinitrate, treats "coronary insufficiency and angina pectoris;" Dorland's at 980.

Finally, Dr. Catania opined that Plaintiff's impairments or treatments would cause him to miss work on a daily basis (R. at 485).

That same day, Dr. Catania also completed a medical source statement ("MSS") of ability to do work related physical activities (R. at 486-490).  In it, Dr. Catania stated that Plaintiff could occasionally lift less than ten pounds, but could never lift more than that amount of weight.  Id.  Dr. Catania opined that Plaintiff could sit and stand continuously for fifteen minutes for a total of two hours for each activity daily.  Id.  Dr. Catania found that Plaintiff did not need to include periods of walking during an eight hour workday, but did require a job which would permit shifting positions at will (R. at 487).  Dr. Catania opined that Plaintiff would need hourly unscheduled breaks during an eight hour workday of about fifteen minutes for each break (R. at 487).  Dr. Catania stated that Plaintiff did not need to elevate his legs, but that he would need a cane or assistive device when doing occasional walking or standing.  Id.  Dr. Catania opined that Plaintiff was severely limited in both upper and lower extremities for pushing and/or pulling.  Id.  Dr. Catania found that Plaintiff could occasionally balance, but could never climb, kneel, crouch, crawl, stoop, or bend and twist at the waist (R. at 488).  Dr. Catania then stated that Plaintiff was constantly limited in his ability to reach, handle, finger, and feel, with both his right and left extremities.  Id.  Dr. Catania opined that Plaintiff had no limitations to see, hear, or speak (R. at 489).  As for environmental limitations, Dr. Catania stated that Plaintiff had no limitations to noise, dust, vibration, humidity/wetness, and fumes, odors, chemicals, gases, but was limited to temperature extremes and hazards (machinery, heights, . . . ).  Id.  Dr. Catania stated that Plaintiff had constant/severe pain in his lumbosacral spine, cervical spine, bilateral chest,

shoulders, knees, ankles, and feet (R. at 490).  This pain, according to Dr. Catania, is

precipitated by stress, movement/overuse, and static position.  Id.  Dr. Catania opined

that emotional factors contributed to the severity of Plaintiff's limitations and Plaintiff's

symptoms would often interfere with his attention and concentration.  Id.  Dr. Catania

stated that Plaintiff was moderately limited in his ability to deal with work stress, and his

impairments were reasonably consistent with the symptoms and functional limitations

described in the evaluation.  Id.

**Independent Medical Examiners**

Plaintiff underwent a psychiatric examination with consultative independent

medical examiner ("IME"), Kristen Barry, Ph.D., at the request of the social security

administration ("SSA") on January 6, 2003 (R. at 341-345).  Dr. Barry diagnosed Plaintiff

with Axis I: "[m]ajor depressive disorder with psychotic features.  History of alcohol

dependence, in remission.  History of polysubstance dependence, in remission" (R. at

341).  In her MSS, Dr. Barry stated that Plaintiff: "is able to follow and understand

simple directions and instructions and he is able to maintain his attention and

concentration.  He appears to be an intelligent individual . . . .  The claimant also

appears to have had difficulty handling stressors."  Id.  Dr. Barry opined that Plaintiff had

a poor prognosis, and recommended that he receive psychiatric treatment.

That same day, Plaintiff underwent an internal medicine examination with IME,

Dr. Ganesh, at the request of the SSA (R. at 346).  Dr. Ganesh diagnosed Plaintiff with

"[s]tatus post cervical spine surgery" and "hyperkinetic syndrome" with a stable

prognosis (R. at 349) (internal quotations omitted).  In Dr. Ganesh's MSS, she stated

that Plaintiff had: "[n]o physical limitation noted to sitting, standing, walking, climbing, or bending.  He has a moderate limitation to lifting, carrying, pushing, pulling."  Id.

### RFC Analysis

On January 15, 2003, a disability analyst[26] filled out a physical residual functional capacity ("RFC") assessment, at the request of the SSA (R. at 93-98).  The analyst found that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight hour workday, sit about six hours in an eight hour workday, and had an unlimited ability to push and/or pull, other than as shown for lift and/or carry (R. at 94).  The analyst found that Plaintiff was occasionally limited in his ability to climb, balance, stoop, kneel, crouch, and crawl (R. at 95).  The analyst found that Plaintiff had no manipulative, visual, communicative or environmental limitations (R. at 95-96).

On February 6, 2003, Dr. Apacible filled out a mental RFC assessment at the request of the SSA (R. at 352-353).  Dr. Apacible found that Plaintiff was not significantly limited in the understanding and memory category, the social interaction category, and the adaption category (R. at 352-353).  Dr. Apacible found that Plaintiff was generally not significantly limited in the sustained concentration and persistence category, with the exceptions that Plaintiff was moderately limited in his abilities to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods (R. at 352-353).

---

[26] The analyst's name was illegible (R. at 98).

That same day, Dr. Apacible also filled out a psychiatric review technique at the request of the SSA (R. at 356-369).  Dr. Apacible diagnosed Plaintiff with major depressive disorder without psychotic features, and a history of substance abuse (R. at 359, 364).  Dr. Apicable opined that Plaintiff had a mild limitation for restriction of daily living activities, a moderate limitation for difficulties in maintaining social functioning, a moderate limitation for difficulties in maintaining concentration, persistence or pace, and there was insufficient evidence to determine whether Plaintiff had repeated episodes of deterioration, each of extended duration (R. at 366).

## Discussion

### Legal Standard of Review:

7.      A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if it is not supported by substantial evidence or there has been a legal error. See  Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

8.     "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]."  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).  In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

9.     The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Social Security Act. See 20 C.F.R. §§ 404.1520, 416.920.  The United States Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987), and it remains the proper approach for analyzing whether a claimant is disabled.

This five-step process is detailed below:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant

has such an impairment, the [Commissioner] will consider him disabled
with-out considering vocational factors such as age, education, and work
experience; the [Commissioner] presumes that a claimant who is afflicted
with a "listed" impairment is unable to perform substantial gainful activity.
Assuming the claimant does not have a listed impairment, the fourth
inquiry is whether, despite the claimant's severe impairment, he has the
residual functional capacity to perform his past work.  Finally, if the
claimant is unable to perform his past work, the [Commissioner] then
determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Rosa v.

Callahan, 168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

10.     While the claimant has the burden of proof as to the first four steps, the

Commissioner has the burden of proof on the fifth and final step.  See Bowen, 482 U.S.

at 146 n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984).  The final step of this

inquiry is, in turn, divided into two parts.  First, the Commissioner must assess the

claimant's job qualifications by considering his physical ability, age, education, and work

experience.  Second, the Commissioner must determine whether jobs exist in the

national economy that a person having the claimant's qualifications could perform.  See

42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458,

460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

11.     In this case, the ALJ made the following findings with regard to factual

information as well as the five-step process set forth above:

1.  The claimant meets the nondisability requirements for a period of
    disability and Disability Insurance Benefits set forth in Section 216(i) of
    the Social Security Act and is insured for benefits through the date of
    this decision.
2.  The claimant has not engaged in substantial gainful activity since the
    alleged onset of disability.
3.  The claimant's disorders of the back and affective disorder are
    considered "severe" based on the requirements in the Regulations 20
    CFR § 404.1520(c).

25

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4 for the reasons enumerated in the narrative of the decision.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. Based on the evidence of record and granting the claimant some benefit of the doubt, the undersigned finds the claimant has retained a residual functional capacity for light and alternatively sedentary exertional level work, as defined in the Social Security Regulations but diminished by the following exertional and non exertional limitations: no work involving climbing scaffolds, ropes, or ladders; no hazardous heights; no hazardous moving machinery; no exposure to extreme temperature changes and no above shoulder upper extremity lifting, carrying, reaching or handling.  He can occasionally climb stairs and ramps, and balance and stoop and crouch but no kneeling or crawling. He can have no concentrated exposure to dust, fumes, chemicals, poor ventilation, excessive humidity, wetness or excessive vibration. Because of the claimant's affective disorder, he requires low-stress routine work {i.e. work requiring no more than moderate attention and concentration, and persistence and pace for prolonged periods}.  He has moderate limitations in his abilities to perform activities within a schedule, maintain regular attendance for reliability purposes and being punctual within customary tolerances.  In addition, he has moderate limitations as to completing a normal work day or work week without interruptions from psychological symptoms and as to performing at a consistent pace without an unreasonable length and number of rest periods.

7. The claimant is able to perform his past relevant work as a dispatcher {requiring lifting of 10 pounds or less and which allowed him to sit or stand at his discretion} and alternatively other work identified by the vocational expert whose credentials were stipulated at the hearing . . . .

8. The claimant is a younger individual age 45-49 . . . .

9. The claimant has a high school (or high school equivalent) education . . . .

10. The claimant's prior use of illegal drugs is not an issue in this case because it predates his date of onset and there is no evidence to indicate that substance abuse is material to the claimant's present claim.  The claimant has no transferable skills from any work previously performed and/or the issue of transferability is not at issue . . . .

11. Although the claimant's exertional limitations do not allow him to perform the full range of sedentary work, using Medical-vocational Rules 202.22 and 201.29 as a framework for decision-making, there

are a significant number of jobs in the national economy that he could perform.  The claimant could work at the light exertional level as an information clerk . . . , a school bus monitor . . . ; at the sedentary level work as a call out operator . . . a charge account clerk . . . and an order clerk . . . .  The jobs and numbers are consistent with the **Directory of Occupational Titles** {except for work the expert identified that involved a sit stand option and that was based upon the expert's own knowledge and experience}.
    . . .

12. There is [not a][27] medically documented 12-month continuous period the claimant was unable to perform his past relevant work as a dispatcher or alternatively other work identified by the impartial vocational expert.

(R. at 27-28).  Ultimately, the ALJ found that Plaintiff was not under a disability at any point up through the date of his decision (R. at 28).

**Plaintiff's Allegations:**

Plaintiff alleges generally that the ALJ's decision was based on legal error and not supported by substantial evidence.  Specifically, Plaintiff argues that (1) the Appeals Council erred in not remanding based on new and material evidence; (2) the ALJ erred in his credibility analysis; (3) the ALJ erred in affording proper weight to Plaintiff's physicians; and (4) the RFC was not supported by substantial evidence.

**Allegation 1: The Appeals Council Erred in Not Remanding Based on New and Material Evidence and that Plaintiff's RFC is No Longer Supported by Substantial Evidence**

12.    Plaintiff's argues that a) the Appeals Council erred in not remanding based on new and material evidence; b) and that Plaintiff's RFC is no longer supported by substantial evidence; and c) the new and material evidence, the physical medical report and MSS of Dr. Catania, should be granted controlling weight.  See Plaintiff's Brief, pp.

---

[27] In context, this Court assumes the ALJ intended to write: there is not a medically documented 12-month continuous period . . . . (R. at 28).

19-22.  Defendant responds by arguing that the report and MSS of Dr. Catania does not constitute new and material evidence.  See Defendant's Brief, pp. 23-25.

> a)  Error by the Appeals Council

Plaintiff's first argument is that the Appeals Council erred in not remanding based on new and material evidence, the physical medical report and MSS of Dr. Catania. See Plaintiff's Brief, pp. 19-22.

The regulations expressly require the Appeals Council consider "new and material" evidence if it "relates to the period on or before the date of the [ALJ's] hearing decision." 20 C.F.R. § 404.970(b); see also § 416.1470(b); Perez v. Chater, 77 F.3d 41, 45 (2d Cir.1996). The Appeals Council "will then review the case if it finds that the [ALJ]'s action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. § 404.970(b) see § 416.1470(b). ""Weight of the evidence" is defined as the balance or preponderance of evidence; the inclination of the greater amount of credible evidence to support one side of the issue rather than the other." HALLEX: Hearings, Appeals and Litigation Manual I-3-3-4 (S.S.A. 2009), available at http://www.ssa.gov/OP_Home/hallex/I-03/I-3-3-4.html.

Even if "the Appeals Council denies review after considering new evidence, the [Commissioner]'s final decision necessarily includes the Appeals Council's conclusion that the ALJ's findings remained correct despite the new evidence". Perez, 77 F.3d at 45. Accordingly, the additional evidence becomes part of the administrative record reviewed by the district court. Id. at 45-46;

Here, the ALJ's decision was dated November 12, 2004 (R. at 29).  After the ALJ's unfavorable decision, Plaintiff submitted several new medical documents to the

28

Appeals Council: (1) medical records from Dr. Catania, dated January 2005 to July 2005; (2) medical records from Dr. Zahn, dated April 2005; and (3) a physical medical report and MSS from Dr. Catania, dated September 9, 2005 (R. at 3A, 463-490).  The Appeals Council declined review on March 23, 2006, despite considering "the additional evidence listed on the enclosed Order of Appeals Council." (R. at 4-6).  Because it appears Plaintiff is only arguing that Dr. Catania's opinions, as set forth in his medical report and MSS, should have warranted remand by the Appeals Council, the report and MSS are the only documents this Court will discuss.

The medical report and MSS were completed by Dr. Catania on the same day, September 9, 2005 (R. at 483-490).  Although they were completed nearly ten months after the ALJ's decision, they covered Plaintiff's treatment history with Dr. Catania, beginning on October 1, 2003 (R. at 378, 483).  Thus, the report and MSS covered Plaintiff's history with Dr. Catania, his treating physician, for over a year before the ALJ's decision.

After reviewing the evidence, the Court cannot find that the Appeals Council erred in declining to review.

### b)  Plaintiff's RFC

Plaintiff argues that because Dr. Catania's opinions, as set forth in his MSS and report, should be granted controlling weight, the ALJ's RFC finding is no longer supported by substantial evidence.  See Plaintiff's Brief, pp. 21-22.  Defendant responds by arguing that Dr. Catania's report was dated after, and concerned events after, the ALJ's decision and as such is not new and material.  See Defendant's Brief, pp. 23-25.

The Second Circuit has held "that new evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision."  Perez, 77 F.3d at 45.  However, only "new and material" evidence that "relate[s] to the period on or before the ALJ's decision" will be admitted.  Id. (citing 20 C.F.R. §§ 404.970(b), 416.1470(b)).  The role of the Court is then to review the record, including the new evidence, to "determine, as in every case, whether there is substantial evidence to support the decision of the Secretary."  Id. at 46.

It is Plaintiff's responsibility to:

> show that the proffered evidence is (1) new and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative… The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently.

Jones v. Sullivan, 949 F.2d 57, 60 (2d Cir. 1991) (internal quotations and citations removed).[28]

Contrary to Defendant's argument, the report and MSS constitute "new and material" evidence, despite the fact that they were dated after the ALJ's decision.  See Armstead ex rel. Villanueva v. Astrue, No. 1:04-CV-503, 2008 WL 4517813, at *17 (N.D.N.Y. Sept. 30, 2008) (finding that a report based on an examination after the ALJ's decision constituted "material" evidence).  Notably, no other of Plaintiff's physicians, treating Plaintiff's physical ailments, completed an MSS or RFC analysis.  It is also significantly more restrictive than the RFC determined by the ALJ.  Because the

---

[28] The law at the time also included a third prong: "good cause for [Plaintiff's] failure to present the evidence earlier."  Jones, 949 F.2d at 60.  However, this prong was later removed from the statute.  Perez, 77 f.3d at 45.

opinions set forth in Dr. Catania's MSS and report may be deserving of "controlling weight," and because they differ significantly from the findings of the consultative physical examiner and disability analyst, the Court cannot find that the ALJ's RFC was supported by substantial evidence.  See Zahirovic v. Astrue, 2008 WL 4519198, at *7-8 (N.D.N.Y. Sept. 30, 2008) (finding that opinions submitted to the Appeals Council by plaintiff's treating orthopedic surgeon and chiropractor, "cast considerable doubt upon the defensability of the ALJ's RFC finding").

### c)  Granting Dr. Catania "Controlling Weight"

Plaintiff also argues that Dr. Catania's opinions should be granted controlling weight.  See Plaintiff's Brief, pp. 21-22.  However, it is the role of the ALJ to determine the appropriate weight granted to the various medical sources in the record.  See 20 C.F.R. §§ 404.1527(d), 416.927(d).  It is the role of the Court is to determine whether the ALJ's decision was supported by substantial evidence and free of legal error.  See Grey, 721 F.2d at 46; Marcus, 615 F.2d at 27.  Thus, the Court will not determine whether Dr. Catania's opinions are entitled to controlling weight.

Therefore, the Court recommends remand to allow the ALJ an opportunity to consider the medical report and MSS of Dr. Catania and grant Dr. Catania's opinions appropriate weight.

### Allegation 2: The ALJ Erred in Analyzing Plaintiff's Credibility

13.    Plaintiff argues: a) the ALJ erred by not following the requirements set forth in SSR 96-7p and 20 C.F.R. § 404.1529; b) the ALJ mischaracterized the evidence; c) the credibility analysis was not based on substantial evidence; d) the ALJ erred in not considering Plaintiff's good work history; and e) the ALJ erred in using Plaintiff's arrest

as a reason for finding Plaintiff not entirely credible.  See Plaintiff's Brief, pp. 5-14.

Defendant responds by arguing that Plaintiff's subjective complaints of pain were

properly assessed by the ALJ in relation to the objective medical evidence and his

consideration of Plaintiff's arrest was appropriate.  See Defendant's Brief, pp. 17-22.

### a)  Following SSR 96-7p and 20 C.F.R. § 404.1529[29]

Plaintiff argues that the ALJ erred in failing to follow the requirements set forth in

SSR 96-7p and 20 C.F.R. § 404.1529.  See Plaintiff's Brief, p. 14.  Defendant responds

by arguing that the ALJ correctly considered Plaintiff's subjective complaints of pain in

relation to the objective medical evidence.  See Defendant's Brief, pp. 17-22.

"An administrative law judge may properly reject claims of severe, disabling pain

after weighing the objective medical evidence in the record, the claimant's demeanor,

and other indicia of credibility, but must set forth his or her reasons with sufficient

specificity to enable us to decide whether the determination is supported by substantial

evidence."  Lewis v. Apfel, 62 F.Supp.2d 648, 651 (N.D.N.Y. 1999) (internal citations

omitted).   To this end, the ALJ must follow a two-step process to evaluate Plaintiff's

contention of pain, set forth in SSR 96-7p, 1996 WL 374186, at *2:

> First, the adjudicator must consider whether there is an underlying
> medically determinable physical or medical impairment (s) . . . that could
> reasonably be expected to produce the individual's pain or other
> symptoms . . . .
> Second, . . . the adjudicator must evaluate the intensity,
> persistence, and limiting effects of the individual's symptoms to determine
> the extent to which the symptoms limit the individual's ability to do basic
> work activities . . . .

---

[29] Plaintiff argues that the ALJ erred in not following 20 C.F.R. § 404.1527.  See Plaintiff's Brief, p. 14.
However, 20 C.F.R. § 404.1527 deals with evaluating medical opinions, and 20 C.F.R. § 1529 deals with
credibility, the Court assumes Plaintiff intended 20 C.F.R. § 404.1529.

According to 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii), if

Plaintiff's pain contentions are not supported by objective medical evidence, the ALJ

must consider the following factors in order to make a determination of Plaintiff's

credibility concerning his pain:

1. [Plaintiff's] daily activities;
2. The location, duration, frequency and intensity of [Plaintiff's] pain or other symptoms;
3. Precipitating and aggravating factors;
4. The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
5. Treatment, other than medication [Plaintiff] receive[s] or ha[s] received for relief of . . . pain or other symptoms;
6. Any measure [Plaintiff] use[s] or ha[s] used to relieve . . . pain or other symptoms;
7. Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

If the ALJ finds Plaintiff's pain contentions are not credible, he must state his

reasons "explicitly and with sufficient specificity to enable the Court to decide whether

there are legitimate reasons for the ALJ's disbelief."  Young v. Astrue, No. 7:05-CV-

1027, 2008 WL 4518992, at *11 (N.D.N.Y. Sept. 30, 2008) (quoting Brandon v. Bowen,

666 F.Supp 604, 608 (S.D.N.Y. 1987)).

The ALJ did not make the necessary finding as to whether Plaintiff's medically

determinable impairments could reasonably cause Plaintiff's pain.  This was error.  See

Hogan v. Astrue, 491 F.Supp.2d 347, 352-353 (W.D.N.Y. 2007) (remanding, in part,

because the ALJ failed to find whether plaintiff's impairments "could reasonably be

expected to produce the pain … she alleged" despite noting that the ALJ "carefully

review[ed]" the seven factors set forth in 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and

416.929(c)(3)(i)-(vii)).

Moreover, despite writing pages on Plaintiff's credibility, the ALJ failed to properly assess the seven factors set forth in 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii)).  Of the seven factors, the ALJ mentioned two: Plaintiff's medications and daily activities (R. at 22-24).

As for Plaintiff's daily activities, instead of noting how these activities supported the finding that Plaintiff was not credible, and could perform more work activities than he was alleging, the ALJ seemed to find just the opposite.  The ALJ believed that "the claimant did substantially more than what he was willing to admit.  The evidence of record supports a greater capacity for engaging in work related activities" (R. at 23).  The ALJ's statement suggests that the daily activities to which Plaintiff testified at the hearing were in fact in line with his pain allegations.  Thus, the only factor the ALJ appropriately considered was Plaintiff's medications.  This was error.  See Sarchese v. Barnhart, 2002 WL 1732802, at *9 (E.D.N.Y. 2002) (finding that "remand is required here, where a review of the transcript of the hearing and the ALJ's written opinion indicates that only one or two of the seven factors was given any consideration before drawing an adverse credibility determination against the claimant").

Therefore, the ALJ did not appropriately consider the seven factors and erred by not following the legal standard.

### b) Mischaracterization of the Evidence

Plaintiff's next argument is that the ALJ mischaracterized the evidence.  See Plaintiff's Brief, pp. 5-13.  Defendant responds by arguing that the ALJ appropriately considered all Plaintiff's medical history.  See Defendant's Brief, pp. 17-22.

Plaintiff cites to several statements in the ALJ's decision that Plaintiff claims mischaracterize the evidence. After a thorough reading of both the ALJ's decision and the record, the Court finds many of Plaintiff's arguments without merit. However, the Court notes the following misstatements by the ALJ: first, although the ALJ wrote that Plaintiff missed an appointment with Dr. Catania on April 12, 2004, Plaintiff did in fact meet with Dr. Catania on that day (R. at 21, 430-431). Second, the ALJ stated that "the claimant testified that he could not do any walking" (R. at 23). However, while testifying at the hearing, Plaintiff never made such a statement or indicated he could not walk at all. Finally, the ALJ stated that Dr. Ghaly found Plaintiff's "capacities for carrying out detailed instructions and making judgments on simple work related decisions were . . . fair" (R. at 21). However, Dr. Ghaly opined that Plaintiff was moderately limited in his ability to carry out detailed instructions and in his ability to make judgments on simple work-related decisions (R. at 434). Therefore, on remand, the ALJ is instructed to carefully review the record.

### c) Credibility Analysis Not Backed by Substantial Evidence

Plaintiff argues that the ALJ's credibility analysis is not based on substantial evidence. See Plaintiff's Brief, pp. 5-13.

The Court cannot determine whether the ALJ's credibility analysis was based on substantial evidence because it was previously determined that the ALJ made an error of law in that analysis. Johnson v. Bowen, 817, F.2d 983, 986 (2d Cir. 1987) (finding that "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to

have her disability determination made according to the correct legal principles");
Plaintiff's Allegation 1(a).

### d)  Plaintiff's Good Work History

Plaintiff appears to be arguing that the ALJ erred in not considering his good
work history.  See Plaintiff's Brief, p. 13.

"A claimant with a good work record is entitled to substantial credibility when
claiming an inability to work because of a disability."  Rivera v. Schweiker, 717 F.2d
719, 725 (2d Cir. 1983).  In assessing the credibility of a Plaintiff's contention of pain,
the ALJ is told to consider, among other things, "prior work record and efforts to work."
SSR 96-7p, 1996 WL 374186, at *5.  It does not appear from the ALJ's decision that he
considered Plaintiff's work history in his credibility analysis.  Because Plaintiff has an
extensive, albeit at times low income, work history dating back to 1973, to fail to
consider this when assessing Plaintiff's credibility was error (R. at 58).  See Wilber v.
Astrue, No. 07-CV-56S, 2008 WL 85037, at *3 (W.D.N.Y. Mar. 28, 2008) (remanding, in
part, for failure to consider plaintiff's good work history of over twenty years in his
credibility analysis).

### e)  The ALJ's Use of Plaintiff's Arrest

Plaintiff's final credibility argument is that "[a]n arrest is not usable in any
proceeding, to the knowledge of the Plaintiff, to impugn the credibility of a witness."
Plaintiff's Brief, p. 12.  Defendant responds by arguing that the ALJ's use of Plaintiff's
arrest was appropriate.  See Defendant's Brief, p. 21.

Notably, Plaintiff did not cite to any legal authority to substantiate this claim.  The
ALJ noted the following concerning Plaintiff's arrest: "[a]s an aside one might also

36

consider that the claimant has not always been found to be credible in his undertakings with others {e.g. staff noted a reference to an arrest for attempted insurance fraud}" (R. at 24).  This statement was the only one made by the ALJ referencing Plaintiff's arrest.

"The administrative law judge may receive evidence at the hearing even though the evidence would not be admissible in court under the rules of evidence used by the court."  20 C.F.R. §§ 404.950(c), 416.1450(c).  Thus, while use of an arrest in another court may be inadmissible, that is not the case in a disability hearing before an ALJ.  Therefore, the ALJ's one statement about Plaintiff's arrest was not error.

As a consequence of the Court's conclusions concerning the deficiencies in the ALJ's credibility findings, the Court recommends remand to allow the ALJ an opportunity to follow the law in analyzing Plaintiff's credibility, to take into account Plaintiff's good work history, and to carefully review the record in that assessment.

### Allegation 3: The ALJ Erred When Affording Weight to Medical Opinions Assessing Plaintiff's Limitations

14.    Plaintiff makes several arguments in this section, with an apparent focus on the ALJ's improper reliance on, and weight granted to, the physical consultative examiner.  See Plaintiff's Brief, pp. 14-18.  Defendant responds by arguing that the RFC was backed by substantial evidence.  See Defendant's Brief, pp. 22-23.

The ALJ made the following findings when granting weight to the various opinions assessing Plaintiff's limitations:

> With reference to the nature and severity of claimant's impairments, the findings by State agency consultants familiar with the evaluation policies of the Social Security Administration are consistent with the preponderance of evidence in the record.  They are thus entitled to great weight (to the extent that they support the established residual functional capacity) since these opinions represent expert opinions by non-

37

examining sources in accordance with 20 CFR § 404.1527 and Social
security Ruling 96-6p.  Significant weight has been accorded to the
opinion of Dr. Ganesh, as this opinion is not inconsistent with the record.
Little weight has been assigned to the opinions of Doctor Finkenstadt and
Ferraraccio as well as that of Ms. Schermerhorn as these opinions are
neither supported by nor consistent with the evidence of record.

(R. at 24).  Because the Court has previously recommended remand to assess the

opinion of Plaintiff's treating physician, Dr. Catania, the weight granted to the other

opinions in the record will necessarily be altered.  Thus, it is inappropriate to analyze

Plaintiff's argument at this time.  However, the Court notes the following errors in the

ALJ's decision that are important to address:

### a)  Psychiatrist Dr. Ghaly

First, the ALJ failed to grant weight to Plaintiff's treating psychiatrist, Dr. Ghaly.

Plaintiff initially saw Dr. Ghaly on September 11, 2003, when he was admitted to the St.

Joseph's Hospital psychiatric ward for suicidal ideation (R. at 386).  Plaintiff continued to

see Dr. Ghaly through November 6, 2003 (R. at 436).  On January 10, 2004, Dr. Ghaly

completed a mental medical report (R. at 433-435).  Although Dr. Ghaly did not treat

Plaintiff for a long period of time, under these circumstances he is still deemed a

treating physician.  See eg. Snell v. Apfel, 177 F.3d 128, 130, 133 (2d Cir. 1999)

(finding that a physician who treated Plaintiff "on at least three occasions" was a treating

physician).

According to the "treating physician's rule,"[30] the ALJ must give controlling weight

to the treating physician's opinion when that opinion is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

---

[30] "The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion." de Roman v. Barnhart, No.03-Civ.0075(RCC)(AJP), 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003).

other substantial evidence in [the] record."  20 C.F.R. § 404.1527(d)(2); see also Green-Younger v. Barnhart, 335 F.3d 99, 105 (2d Cir. 2003); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000).  Thus, "[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is ground for remand."  Snell, 177 F.3d at 133 (2d Cir. 1999) (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)).

Even if a treating physician's opinion is deemed not to be deserving of controlling weight, an ALJ may nonetheless give it "extra weight" under certain circumstances. Under 20 C.F.R. § 404.1527(d)(1)-(6), the ALJ should consider the following factors when determining the proper weight to afford the treating physician's opinion if it is not entitled to controlling weight: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the court.  See de Roman, 2003 WL 21511160, at *9 (citing C.F.R. § 404.1527(d)(2)); see also Shaw, 221 F.3d at 134; Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

Although the ALJ recited Plaintiff's treatment history with Dr. Ghaly at the Hospital and discussed Dr. Ghaly's mental impairment questionnaire, the ALJ apparently failed to grant Dr. Ghaly's opinion any weight.  This error is significant given that Dr. Ghaly was Plaintiff's only treating psychiatrist for the relevant time period.

While the ALJ is free to appropriately discount the weight granted to a treating physician, "[a]t the very least, the Commissioner must give express recognition to a treating source's report and explain his or her reasons for discrediting such a report." Pagan v. Apfel, 99 F.Supp.2d 407, 411 (S.D.N.Y. 2000) (citing Snell, 177 F.3d at 133).

### b)  Disability Analyst

The ALJ also erred in granting the disability analyst "great weight" (R. at 24). It is unclear from the ALJ's decision whether he was aware the individual completing Plaintiff's physical RFC assessment was a disability analyst, and not a physician (R. at 93-98).  Because the individual was an analyst, and not a physician, the analyst is "not considered to be an acceptable medical source under the Regulations."  Bell v. Astrue, No. 7:06-CV-865, 2008 WL 4936830, at *11 (N.D.N.Y. Nov. 18, 2008) (quoting Hopper v. Comm'r of Soc. Sec., No. 06-CV-38, 2008 WL 724228, at *10 (N.D.N.Y. Mar. 17, 2008)).  It was, therefore, error to grant the disability analyst "great weight."  See Hopper, 2008 WL 4936830, at *10 (finding no error where the ALJ did not afford the disability analyst any weight as "the assessment was not a medical source opinion entitled to any weight"); see also Arteaga v. Astrue, No. 06 Civ. 1244, 2007 WL 2402871, at *17 (S.D.N.Y. Aug. 15, 2007) (the court found the ALJ's statement that a disability analyst was entitled to medical weight erroneous).

Therefore, the Court recommends that on remand, the ALJ give appropriate weight to the report of Dr. Ghaly, and properly consider the report of the disability analyst.

### Allegation 4: The ALJ's RFC is Not Supported by Substantial Evidence

15.	Plaintiff's final argument is that the RFC is not supported by substantial evidence because a) The ALJ erred with respect to credibility and medical opinions; b) the

explanation behind the ALJ's RFC analysis was not fully articulated; and c) the ALJ

failed to include limitations from Plaintiff's obesity.  See Plaintiff's Brief, pp. 17-19

### a)  Errors with Credibility and Medical Opinions

Plaintiff argues that because of previous errors in the credibility analysis and the

weight afforded to various opinions, the RFC is necessarily flawed.  See Plaintiff's Brief,

p. 18-19.  The Court agrees.  The Court also notes that the RFC is necessarily flawed

because it does not take into account the opinions of Dr. Catania.

### b)  RFC Explanation Not Fully Articulated

Plaintiff also argues that the explanation behind the RFC determination was not

fully articulated.  See Plaintiff's Brief, pp. 18-19.

> The RFC assessment must include a narrative discussion
> describing how the evidence supports each conclusion, citing specific
> medical facts (e.g., laboratory findings) and nonmedical evidence (e.g.,
> daily activities, observations). In assessing RFC, the adjudicator must
> discuss the individual's ability to perform sustained work activities in an
> ordinary work setting on a regular and continuing basis (i.e., 8 hours a
> day, for 5 days a week, or an equivalent work schedule) and describe the
> maximum amount of each work-related activity the individual can perform
> based on the evidence available in the case record. The adjudicator must
> also explain how any material inconsistencies or ambiguities in the
> evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184, *7.

Here the ALJ gave a fairly thorough recitation of Plaintiff's medical history dating

back to his accident in October 1998, and up until April 2004 (R. at 16-21).  Thus, the

Court finds no error in the ALJ's narrative.

### c)  Failure to Include Limitations from Obesity

Plaintiff's final argument is that the ALJ failed to include in the RFC any

limitations from Plaintiff's obesity.  See Plaintiff's Brief, pp. 17-18.

No error can be found in the ALJ's analysis of Plaintiff's obesity.  The ALJ must "consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§ 416.920(c), 416.921, and 416.923, when we assess your residual functional capacity."  20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).

Here the ALJ found that "[w]hile the claimant's obesity was fully considered[,] the medical evidence of record fails to support that his obesity either individually or in combination precluded the claimant from working during any 12-month continuous period from date of onset" (R. at 23).  The ALJ also stated that obesity, "impacts his overall ability to be active, and is assessed with his other impairments in arriving at his residual functional capacity . . . ." (R. at 16).  Thus, the ALJ specifically stated he considered Plaintiff's obesity in the RFC.

For the reasons stated above, on remand, the ALJ must consider the new and material evidence and correctly assess Plaintiff's credibility, to determine an appropriate RFC.

## Conclusion

Based on the foregoing, it is recommended that Defendant's motion for judgment on the pleadings should be DENIED; Plaintiff's cross motion for judgment on the pleadings should be DENIED in part and GRANTED in part and REMANDED for reconsideration.

Respectfully submitted,

Victor E. Bianchini
United States Magistrate Judge

Syracuse, New York

DATED:        April 10, 2009

## ORDERS

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985);   *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989);   *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

43

Let the Clerk send a copy of this Report and recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

Victor E. Bianchini
United States Magistrate Judge


Syracuse, New York

DATED:      April 10, 2009